UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-80362-CIV-DIMITROULEAS/Snow

STEVEN A. BUCCO,

        Plaintiff,

    vs.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

This cause is before the Court on the plaintiff's complaint seeking judicial review of a final decision of the Social Security Administration denying the plaintiff's application for disability insurance and supplemental security income (SSI) benefits.  The complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et. seq., and was referred to United States Magistrate Judge Lurana S. Snow for report and recommendation.

**I. PROCEDURAL HISTORY**

The plaintiff filed an application for disability benefits on April 19, 2005, alleging disability since September 1, 2002, as a result of congestive heart failure and hypertension. The application was denied initially and upon reconsideration.  The plaintiff then requested a hearing which was held on August 26, 2006, before Administrative Law Judge (ALJ) Roger Spurlin. The ALJ

found that the plaintiff was not disabled within the meaning of the Social Security Act.  The Appeals Council remanded the case and ordered the ALJ to obtain testimony from a vocational expert.

A second hearing was conducted by the ALJ on September 11, 2007.  The ALJ again found that the plaintiff was not disabled. The Appeals Council, after considering additional evidence, denied the plaintiff's request for review on December 29, 2008.  The plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. FACTS

The plaintiff was born on July 1, 1954, and was 53 years old at the time of his second hearing.  He had a 10th grade education and resided with his mother and sister.  The plaintiff's past relevant work was as a meat cutter and as an auto salvage yard manager. (R: 73, 77, 390, 418)

The medical record reflects that on August 19, 2003, the plaintiff presented to Seraphin J. Manfredonia, M.D., complaining of pain in his rotator cuff and ankle.  The doctor prescribed Roxicodone, Lorcet and Xanax for pain, as well as back exercises. The medication regularly was refilled, and was replaced on February 24, 2004, when the plaintiff reported that his medications had been stolen from his vehicle while he was at work.  (R:133-36)

On April 1, 2004, an MRI of the plaintiff's lumbar spine revealed moderate levoscoliosis, minimal acute compression fractures of L2 and L3 and diffuse lumbar spondylosis. (R:137-38) On April 4, 2004, Dr. Manfredonia added a prescription for methadone and eliminated Lorcet.  The plaintiff continued to refill his prescriptions through May 9, 2005. (R:130-32)

On April 19, 2005, the plaintiff presented to the JFK Medical Center in Atlantis, Florida, where a portable chest X-ray showed no abnormalities.  (R:358)  On April 20, 2005, progress notes from the Florida Department of Health clinic indicate that the plaintiff had been diagnosed with congestive heart failure and was referred to the clinic for follow-up care.[1]  The notes also reflect that the plaintiff was in no acute distress, was alert and oriented X3 and displayed symptoms of edema in his lower extremities.  (R:139)

On April 27, 2005, a cardiac evaluation of the plaintiff was performed by Jeffrey L. Sutton, M.D.  The plaintiff told Dr. Sutton that he had been in good medical health, but during the preceding six months had been fatigued and had experienced shortness of breath.  Dr. Sutton noted, parenthetically, that the plaintiff had been a drug user and for a number of years was taking

---

[1]There are no records reflecting such a diagnosis by anyone at JFK, suggesting that the information regarding congestive heart failure came from the plaintiff.

200 mg of methadone per day. The plaintiff reported that he had been drinking alcohol (four or five beers per day), but had stopped because of nausea and vomiting.  He had gained about 40 pounds. (R:142)

Dr. Sutton noted that the plaintiff's chest X-ray was normal.  He had been treated at JFK Medical Center with Lasix to eliminate excess fluid, after which he was discharged.   The plaintiff reported that he was feeling better, with some improvement in appetite, but he was still short of breath.  Dr. Sutton's examination revealed no cardiac abnormalities. Dr. Sutton diagnosed shortness of breath, dyspnea syndrome and Hepatitis B, and recommended a cardiac echo to determine if the plaintiff had a cardiomyopathy.  He added that the peripheral edema was no longer present, but had been quite significant within the preceding week. (R:142-3)

On May 8, 2004, an X-ray of the plaintiff's chest revealed no evidence of acute pulmonary disease.  (R:359)  On May 17, 2005, the plaintiff again presented to JFK Medical Center, complaining of shortness of breath.   He was admitted with a diagnosis of fluid overload.  The plaintiff was evaluated again by Dr. Sutton, who diagnosed peripheral edema. Dr. Sutton noted that the plaintiff had no radiographic or biochemical evidence of heart failure and again recommended an echocardiogram. (R:144-48)

4

On May 17, 2004, the plaintiff was examined by Evan Kraus, M.D., at JFK Medical Center.  The plaintiff complained of tightness in his chest, shortness of breath, dyspnea on exertion and diaphoresis.  The plaintiff reported that previously he had responded to Lasix, but it was no longer effective.  Examination of the plaintiff's heart revealed no abnormality and a chest X-ray showed only mild increased vascularity, but there was +3 pitting edema in the plaintiff's extremities.  Dr. Kraus diagnosed sarcoidosis.  He noted the plaintiff's history of Hepatitis B and expressed concern that the plaintiff might be developing chronic cirrhosis.  Dr. Kraus also noted the plaintiff's history of intravenous drug abuse and the fact that the plaintiff was on an extremely high dosage of methadone (170 mg per day).  (R:149-51)

On September 30, 2004, James M. Andriole, D.O., a non-examining State Agency physician, completed a Physical Residual Functional Capacity Assessment of the plaintiff.  Dr. Andriole opined that the plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could stand and/or walk or sit for about 6 hours during an 8-hour workday; had an unlimited ability to push and/or pull; could balance, stoop, kneel, crouch and crawl frequently, but climb only occasionally, and had no manipulative, visual, communicative or environmental limitations.  Dr. Andriole stated that he had reviewed statements from the plaintiff's treating

5

sources and that his opinion did not conflict with any of those statements. (R:189-95)

On the same date, Robert L. Steele, M.D., another non-examining State Agency physician, also completed a Physical Residual Functional Capacity Assessment of the plaintiff. Dr. Steele believed that the plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could stand and/or walk or sit for about 6 hours during an 8-hour workday; had an unlimited ability to push and/or pull; could balance, stoop, kneel, crouch and crawl frequently, but climb only occasionally, and had no manipulative, visual or communicative limitations. The only environmental limitation was that the plaintiff had to avoid fumes, odors, dust, gases and poor ventilation. Dr. Steele based his findings on the facts that the plaintiff suffered from liver disease, as well as chronic pain and fatigue; had a history of alcohol and drug abuse; was positive for hepatitis B; had a benign abdominal exam; had 5/5 and 4/5 grip strength with no dexterity limitations; had clear lungs and normal heart function, and pitting edema in the lower extremities. The doctor opined that the plaintiff's description of his symptoms was only partially credible. (R:240-47)

On May 19, 2005, an echocardiogram was performed on the plaintiff. The test revealed normal left ventricular size and

function, trivial mitral regurgitation, minimal aortic stenosis and mild tricuspid regurgitation without pulmonary hypertension. (R:345)

On June 3, 2005, the plaintiff presented to Valentina Gherghina, M.D., with complaints of fatigue and intermittent chest pain. Dr. Ghergina's examination indicated no abnormalities other than obesity. The plaintiff had full range of motion in his back and extremities. Dr. Ghergina's assessment was chest pain, on and off, fatigue, GERD, insomnia, Hepatitis A and B and history of sarcoidosis. (R:167)

On June 22, 2005, a consultative physical examination of the plaintiff was performed by Ben Scharf, D.O. The plaintiff told Dr. Scharf that his primary complaints were fatigue, multiple myalgia, pain in the abdomen, lower back and lower extremities, headaches and dizziness. He also reported feeling depressed and anxious since he became ill. Dr. Scharf noted the plaintiff's history of liver disease, hepatitis B, alcoholism, IV drug use, sarcoidosis and depression. He also mentioned that a recent CT-scan of the plaintiff's abdomen showed evidence of hepatomegaly, mild prominence of the spleen, fat within the abdominal cavity and a 2.8 cm cyst arising from the upper pole of the plaintiff's right kidney or right adrenal. (R:175)

Neurological examination revealed that the plaintiff was alert, conscious, coherent and oriented X3.  He was cooperative and, although he reported a history of depression, he was stable at the time of the examination.  The plaintiff's memory was good and his judgment was well preserved. (R:177)

Physical examination showed that the plaintiff's heart was in sinus rhythm with a rate of 70 per minute with no murmur. His lungs were clear and his abdomen was obese and soft.  His liver was enlarged and tender to palpation 5-6 cm below the right costal margin.  There was also tenderness to palpation of the plaintiff's lumbar spine.  His grip strength was 5/5 bilaterally in the plaintiff's hands; leg grip strength was 4/5 bilaterally.  The plaintiff's right ankle was swollen and limited, and a bilateral pretibial pitting edema was noted.  The plaintiff had full range of motion except for slightly decreased forward flexion, extension and lateral flexion in the lumbar spine.  (R:177-79)

Dr. Scharf's diagnostic impressions were chronic liver disease; status-post hepatitis B; alcohol abuser and drug user by history; sarcoidosis by history; depression; multiple myalgia by history; pain the lower back and both legs by history; "easy fatigability" by history, and headaches and dizziness by history. (R:178)

On June 24, 2005, the plaintiff returned to Dr. Ghergina for follow-up. The plaintiff was in no acute distress and examination revealed no abnormalities. The plaintiff had full range of motion in his extremities and his lungs were clear. On July 14, 2005, the plaintiff told Dr. Ghergina that he had injured his nose during an accident involving a chain link fence. This was confirmed by a CT scan, which showed a fractured nasal bone. (R:165-66) On July 18, 2005, a closed nasal fracture reduction with stabilization was performed on the plaintiff. (R:334) On July 22, 2005, the plaintiff complained to Dr. Ghergina only of nausea and GERD symptoms. (R:163)

On July 26, 2005, a consultative psychological examination was performed by Gary M. Weinberger, Psy.D. The plaintiff told Dr. Weinberger that he had a history of seizures in the 1990s, which likely were substance related (heroin use from 1980 to 1996). The plaintiff also stated that he had been diagnosed with heart disease in 2004. The plaintiff reported that he was unable to sleep for more than a few hours at a time and had a poor appetite, which had improved somewhat. The plaintiff was able to feed, dress and bathe himself, but could not drive, shop, cook or manage his finances. The plaintiff related that he does not like to go out in public because he feels paranoid. He stated that he prays for death but is not actively suicidal. In 1995 the

9

plaintiff saw his wife as she was hit by a car and killed, and said that the sights and sounds of the accident have stayed with him. (R:185)

Dr. Weinberger observed that the plaintiff ambulated without difficulty and had good eye contact.   However, the plaintiff nodded off at times, explaining that he had taken his medication before the evaluation.   The plaintiff reported experiencing overwhelming feelings of guilt over the death of his wife and because he had become a burden to his mother and sister. His mood was morose with a full range of affect and no sign of psychosis. (R:185-6)

After administering the Wechsler Memory Scale and Rev 15 Items Task tests, Dr. Weinberger concluded that the plaintiff's general memory and immediate memory were within the extremely low range.   His working memory, which includes the ability to attend and concentrate, was within the average range.   The plaintiff's attention was poor with normal concentration.   He could not interpret common proverbs and his general knowledge was poor.   He could complete the complex mental tracking task of subtracting 103 by sevens.   The plaintiff's social cognition was borderline, but his capacity for abstract reasoning and ability to perform simple calculations were within normal limits. (R:186)

Dr. Weinberger did not believe the plaintiff would be able to manage his finances without help and regular reminders. His diagnostic impressions were Amnesic Disorder NOS; Posttraumatic Stress Disorder (PTSD); Social Phobia, and Major Depressive Disorder, Recurrent, Moderate. (R:186)

On August 25, 2005, Angela Register, PhD., a non-examining State Agency psychologist, completed a Psychiatric Review Technique Form regarding the plaintiff. Dr. Register found that the plaintiff suffered from depressive disorder, characterized by anhedonia, sleep disturbance, feelings of guilt or worthlessness and difficulty concentrating or thinking. She also found that the plaintiff suffered from mild PTSD, and had  a history of alcohol abuse and IV heroin dependence. Dr. Register concluded that the plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace and no episodes of decompensation. (R:200-201; 204, 206)

Regarding Dr. Weinberger's evaluation, Dr. Register opined that the plaintiff's nodding off and becoming disoriented likely was due to the quantities of medication he had taken. She believed that there was no factual support for Dr. Weinberger's diagnosis of Amnesic Disorder, noting that the plaintiff had no memory deficits at the consultative physical examination performed

11

by Dr. Scharf.  Dr. Register suggested that the plaintiff's memory deficits were the result of medication.  Similarly, she believed that there was no evidence of PTSD other than bereavement and guilt over his wife's death, and that there was no history or functional information to support the diagnosis of Social Phobia.  Dr. Register stated that the plaintiff clearly had been over-diagnosed by Dr. Weinberger based on the plaintiff's history. (R:208)

Dr. Register's assessment was that the plaintiff was moderately depressed and in bereavement over the tragic death of his wife in 1996, but noted that he had worked until 2002 and stopped working as the result of physical symptoms.  Additionally, a third party report indicated that the plaintiff had refused to take antidepressants that recently had been prescribed for him. Although she found that the plaintiff did appear to have moderate depression and mild PTSD, Dr. Register believed that the plaintiff had the capacity to perform simple repetitive tasks. (R:209)

On October 7, 2005, the plaintiff returned to Dr. Ghergina, complaining of nausea and acid reflux.  Dr. Ghergina noted that the plaintiff was not in acute distress, had full range of motion in his back and extremities and no tenderness in his abdomen.  The doctor's assessment was abdominal pain, weight loss and chronic liver disease. (R:162)

12

On October 17, 2005, upon referral by Dr. Ghergina, the plaintiff presented to David Hellman, D.O., a gatroenterologist. The plaintiff told Dr. Hellman that for the past two to three years he had suffered from periodic bouts of nausea, resulting in decreased appetite and weight loss.  The plaintiff also stated that for the past couple of years he had been drinking a six pack of beer each day, but that he had quit drinking two months earlier. (R:214)

Dr. Hellman's examination revealed regular heart rate and rhythm, no tenderness in the abdomen and no edema in the extremities.  The doctor's assessment was recurrent nausea and vomiting with right upper quadrant pain.  For diagnostic purposes, he recommended an ultrasound of the abdomen and, if negative, an HIDA scan.  If the HIDA scan proved negative, the plaintiff should have a gastric emptying study and, if that were negative, an EGD. (R:215)

On November 18, 2005, the plaintiff returned to Dr. Ghergina, again complaining of nausea, acid reflux and insomnia. The plaintiff reported that he had drunk a beer the preceding week. He also told Dr. Ghergina that he had seen Dr. Hellman and had an ultrasound.  Dr. Ghergina's assessment was chronic liver disease, hepatitis B, anxiety and depression.  She prescribed Paxil for depression and Ambien for insomnia. (R:160-61)

13

On December 11, 2005, a second Psychiatric Review Technique form was completed by Eric Martin, Ph.D., a State Agency non-examining psychologist. Dr. Martin opined that the plaintiff suffered from Major Depression, PTSD and Substance Abuse History, but that his symptoms did not meet the criteria for these listings. Dr. Martin believed that the plaintiff had mild restrictions of activities of daily living and in maintaining social functioning, moderate difficulties in maintaining concentration persistence and pace and no episodes of decompensation. He noted that the plaintiff has declined to seek treatment for his psychological symptoms. (R:224-30)

On December 17, 2005, the plaintiff presented to the emergency department of the JFK Medical Center after an injury to his left hand from a nail gun. X-rays revealed no radiopague foreign bodies or osseous traumatic injury, but there was soft tissue swelling. (R:346) The record indicates that the plaintiff sought no medical treatment for nearly 19 months following the December 2005 emergency room visit.

On June 12, 2007, Jeannine M. Salek, a vocational expert, completed a questionnaire regarding the plaintiff's application for benefits. (R: 281-86) Ms. Salek was given the following set of hypothetical facts:

> Assume a hypothetical individual with the claimant's age, education and past relevant

> work.   Assume the individual can lift 20
> pounds occasionally and ten pounds frequently,
> stand and walk about six hours and sit for six
> hours in an eight hour workday.  He can climb
> occasionally.   He should avoid concentrated
> exposure to tasks that involve pulmonary
> irritants or those tasks that are more than
> simple and routine in nature.

(R:284) Based on these facts, Ms. Salek opined that the plaintiff
could not perform his past relevant work, which was classified as
heavy work, but could perform the jobs of office
cleaner/housekeeper, cashier and sales attendant.  These jobs
existed in significant numbers in the national economy and the
state of Florida.  Id.

On July 3, 2007, he returned to Dr. Hellman, who noted
that gastric emptying and HIDA scans had produced normal results
and EGD was negative.  He diagnosed chronic nausea and hepatitis C
antibody positive with undetected viral load.  Dr. Hellman
recommended a neurological evaluation and possible CT of the head
to determine whether the plaintiff's chronic nausea was
neurological in nature. (R:372)

On August 22, 2007, an MRI of the plaintiff's cervical
spine was performed.  It revealed lymph node enlargement in the
right paratracheal and possibly left paratracheal and subcarinal
regions. Also, there was mild bilateral foraminal stenosis at C4-5
and C5-6 due to disc bulging and uncovertebral hypertrophy at both
levels.  A disc bulge and mild anterior subluxation contributed to

15

mild central canal stenosis at the C5-6 level.  The MRI also showed mild to moderate central canal stenosis and mild right C7 foraminal stenosis at C6-7 due to spondylosis.  Finally, there was solid fusion of the C7 and T1 vertebral bodies. (R:327-28)

On August 31, 2007, the plaintiff presented to Oscar Farronay, M.D., a neurologist.  Dr. Farronay's examination revealed abnormal motor system, deep tendon reflexes and gait/station. Sensory and cerebellar functions were within normal limits.  Dr. Farronay recommended the following diagnostic tests: MRIs of the lumbar and cervical spines, EMG, EEG and echocardiogram.  He also recommended pain management and physical therapy. (R:318-19)

EEG and videonystagmography tests were performed the following day and yielded normal results.  Dr. Farronay noted these results and conducted another examination of the plaintiff. Neurological results were the same as on the preceding day. Physical examination revealed no abnormalities.  The plaintiff's mental status was mildly anxious. (R:314-15)

The plaintiff returned to Dr. Farronay on October 2, 2007, complaining of cervical and back pain.  The plaintiff's mental status was moderately depressed, but physical examination was within normal limits.  Dr. Farronay opined that the plaintiff's symptoms were well controlled, but ordered an MRI of the plaintiff's lumbar spine.  The MRI revealed moderate to severe

16

scoliosis; multilevel moderate to severe degenerative disc disease from L2-L3 through L4-L5 (more pronounced at L2-L3 where there was evidence of an old compression fracture); moderate to severe central canal stenosis more pronounced at L2-L3 and L3-L4, and no evidence of myelopathy or demyelinating disease. (R:307, 310-12)

On October 11, 2007, the plaintiff presented again to Dr. Farronay, complaining of back pain, gait abnormality and depression. During the physical examination, Dr. Farronay observed that the plaintiff had a muscle spasm in his neck and moderate spasm in his back. The plaintiff's mental status was anxious. Neurological examination revealed antalgic gait and difficulties in movement of the lower extremities. The plaintiff's symptoms were described as unimproved. Dr. Farronay gave the plaintiff a pain injection and advised a surgical consultation. (R:303-04)

On November 14, 2007, Dr. Farronay noted the same neurological symptoms, but opined that those symptoms were well controlled. He recommended a pain management consult and physical therapy. The plaintiff's Xanax and methadone (reduced now to 40 mg) prescriptions were renewed. (R:301-02)

On December 13, 2007, Dr. Farronay's physical examination of the plaintiff yielded normal results. The plaintiff's mental status was mildly anxious. Neurological examination indicated that the plaintiff's motor system functions had improved to within

normal limits, although his gait remained antalgic.  His symptoms were well controlled.  Dr. Farronay recommended a pain management consult and continuation of physical therapy. (R:298-99)

On January 14, 2008, the plaintiff's symptoms were unimproved and on February 14, 2008, his symptoms were failing to change as expected.  Dr. Farronay continued to renew the plaintiff's prescriptions, with methadone reduced to 10 mg, and to recommend pain management consult and physical therapy. (R:291-97)

On March 5, 2008, Freddy Avni, M.D., completed a Physical Residual Functional Capacity Questionnaire pertaining to the plaintiff.  Dr. Avni stated that his frequency and length of contact with the plaintiff was "lifetime," although there are no treatment records from Dr. Avni in the file.  Dr. Avni listed the plaintiff's diagnoses as sarcoidosis, arthropathy and backache, and stated that the plaintiff's prognosis was poor.  The plaintiff's symptoms were pain, fatigue, dizziness and inflammation.  His pain was in his upper and lower extremities, precipitated by sitting or standing for long periods of time.  His medications caused drowsiness, dizziness, nausea and headache. (R:377)

Dr. Avni opined that the plaintiff's symptoms had lasted or could be expected to last at least twelve months.  He did not believe that the plaintiff was a malingerer, but did believe that psychological factors consisting of depression and anxiety affected

18

the plaintiff's physical condition.  Dr. Avni stated that the plaintiff's experience of pain and other symptoms would interfere frequently with the attention and concentration needed to perform even simple work tasks, and that the plaintiff was incapable of even low stress jobs. (R:378)

Dr. Avni concluded that the plaintiff could sit or stand for 20 to 30 minutes at a time, and for less than two hours total in an 8-hour workday.  The plaintiff was required to walk every 20 to 30 minutes for 15 minutes and would need to rest for 30 minutes every hour.  The plaintiff needed to keep his legs elevated during prolonged sitting and required an assistive device in order to walk. (R:378-79)

Dr. Avni opined that the plaintiff could lift less than 10 pounds occasionally and could never lift 20 pounds.  He could rarely twist, stoop, crouch, climb ladders or climb stairs and had significant limitations with reaching, handling or fingering.  The plaintiff would have "bad days" about four days per month in which he would be absent from work.  Finally, Dr. Avni stated that earliest date on which his description of symptoms and limitations appeared was October 5, 2007. (R:379-81)

At his first (2006) administrative hearing, the plaintiff testified that his drug addiction had been to heroin, from which he detoxified in 1996.  He stated that he suffers from constant nausea

and has had hepatitis several times.  The plaintiff testified that he gets severe migraine-like headaches all the time. He also experienced pain in his lower back, perhaps as a result of cutting meat.  He suffered pain his right knee as well, and had pins and plates in his right ankle.   The plaintiff still experienced occasional coughing spells from his sarcoidosis. Regarding depression, the plaintiff stated that he did not like to be around people and came out of his room only to eat. (R:390-91, 398-400)

The plaintiff explained that he was fired from his last job because he missed too much work as a result of fatigue and nausea.  Since that time, he also suffers from edema and had been diagnosed with congestive heart failure.   Additionally, the plaintiff had a very difficult time sleeping.   The plaintiff pointed out that he had been prescribed methadone for pain, not for his heroin addiction.  He stated that he still prayed every day for death. (R:400-02)

Gail Lehman, Ph.D., a psychologist, was qualified as a medical expert and testified that the plaintiff's hepatitis B and C and liver disease could have been caused by his long history of drug abuse.  She did not believe sarcoidosis would have anything to do with drug use. Dr. Lehman stated that the plaintiff's basic complaints were fatigue, myalgia and pain in his abdomen.  (R:392)

20

Dr. Lehman noted that the report of Dr. Weinberger's psychological examination made no mention of the plaintiff taking methadone, which is a sedative. Based on the limited information contained in the report, as well as the likely effects of methadone on the plaintiff's performance on the memory tests, Dr. Lehman questioned Dr. Weinberger's diagnoses of Amnesic Disorder, PTSD and Social Phobia. She did believe that the plaintiff displayed symptoms of depression, but these symptoms did not meet or equal any of the mental impairments listed in the Social Security Regulations. (R:393-96)

At the commencement of the second (2007) hearing, ALJ stated that he was troubled by the absence of medical records for the time period between the first and second hearings. (R:408) In response, counsel for the plaintiff stated that he was not notified of the second hearing until approximately one month prior to the hearing date. Counsel stated that the plaintiff's treating physicians, Dr. Toward and Dr. Faranay, had been uncooperative, and counsel requested a continuance. The ALJ denied the request, pointing out that the lawyer who was representing the plaintiff had filed his appeal, and stating that there were thousands of claimants waiting for hearings and a delay in one caused a delay for those who were waiting. The ALJ also stated that there was a new Commissioner who was coming down hard on the ALJs for granting

continuances.   Nevertheless, the ALJ reiterated that he was bothered by the lack of new evidence. (R:406-409)

Counsel for the plaintiff then amended his request, asking the ALJ to keep the record open for five to ten days to allow him to obtain the missing records.   The ALJ denied the request, stating that he had over one hundred cases to resolve within the next few months and if he kept on keeping them open he would never get anything done.   (R:410)

The plaintiff testified that he worked collecting trash in his housing complex for about a year.   During that time, the plaintiff worked for three or four hours a day on the days he felt good.   Generally this involved about ten or twelve hours per week. (R:410-11)

At the time of the hearing, the plaintiff was taking Protonix for acid reflux, Xanax for anxiety, Lasix for edema and methadone for pain.   These medications were prescribed the by Dr. Timothy Toward, the plaintiff's primary physician for the preceding two years.   The plaintiff described his vain attempts to obtain medical records and a completed questionnaire from Dr. Tower prior to the hearing.

The plaintiff described his daily activities as watching television and taking his dog for short walks.   The plaintiff's sister, Patricia Bucco, testified that the plaintiff stayed in his

22

room for one year.  When Ms. Bucco was not there to help him out, the plaintiff did not do anything.  She added that the plaintiff was not lazy, but often had to stay in bed because he was sick and suffering from terrible nausea.  Ms. Bucco estimated that this happened 20 to 25 days per month. (R:516, 520-21)

### III. DECISION OF THE ALJ

The ALJ first found that the plaintiff met the insured status requirements of the Social Security Act through September 30, 2004 and that he had not engaged in substantial gainful activity since the alleged onset date of September 1, 2002.  The ALJ also found that the plaintiff had severe impairments consisting of chronic liver disease, hepatitis B, history of drug and alcohol abuse, depression and anxiety, but that he did not have an impairment or combination of impairments which met or medically equaled and of the impairments listed in 20 C.F.R. Part 404, Subpart B, Appendix 1.  (R:20-21)

The ALJ determined that the plaintiff's mental impairment did not meet or equal the criteria of any listed impairment because he had only mild restriction in the activities of daily living and in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and no episodes of decompensation.  The ALJ pointed out that in order to meet a listed impairment, the plaintiff would have to exhibit marked difficulties

23

in at least two of these categories. In so finding, the ALJ gave great weight the findings the non-examining State Agency psychologists because they cited specific facts on which their conclusions were based. (R:21)

Next, the ALJ found that the plaintiff had the residual functional capacity to perform light work, except that he could climb only occasionally, should avoid concentrated exposure to tasks that involved pulmonary irritants and was able to perform only simple routine tasks.  The ALJ noted that when the plaintiff filed his application for benefits, he alleged shortness of breath, swelling in his ankles and stomach, fatigue and dizziness.  He also alleged that he experienced pain in his chest, ankles and back. The plaintiff estimated that he could walk one block slowly and lift 30 pounds.  The ALJ determined that although the plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, the plaintiff's statements regarding the intensity, persistence and limiting effects of these symptoms were not entirely credible.  After summarizing the medical evidence of record, the opinions of the non-examining State Agency consultants the ALJ and the testimony of the plaintiff and his sister, the ALJ accorded great weight to the testimony of the State Agency physicians because they explained how the evidence supported

their conclusions and cited specific facts upon which their conclusions were based. (R:22-4)

The ALJ next determined that the plaintiff could not perform his past relevant work as a butcher, which was classified as heavy work.  The ALJ noted that the plaintiff was 48 years old at the time of his alleged disability onset date, making him a younger individual for disability purposes.  He had a limited education and was able to communicate in English.  Transferability of job skills was not material to the determination of disability. The ALJ found that, considering the plaintiff's age, education, work experience and residual functional capacity, there were jobs which existed in significant numbers in the national economy which the plaintiff could perform.  Based on the testimony of the vocational expert, the plaintiff could perform the jobs of cleaner/housekeeper, cashier and sales attendant.  Accordingly, the plaintiff was not disabled within the meaning of the Social Security Act.  (R:24-5)

### IV. CROSS MOTIONS FOR SUMMARY JUDGMENT

The plaintiff seeks reversal or remand on three grounds: (1) the ALJ erred in refusing to keep the record open for a brief period of time so that the plaintiff could obtain records from his treating physicians; (2) the ALJ erred in his determination that the plaintiff retained the residual functional capacity to perform

light work, and (3) the Appeals Council erred in refusing to consider new and material evidence submitted by the plaintiff.

The Commissioner seeks summary judgment on the basis that the decision of the ALJ was supported by substantial evidence and the correct legal standards were applied.

### V. RECOMMENDATIONS OF LAW

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence. "Even if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence." <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1985). Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389 (1971); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233 (11th Cir. 1983). The Court must review the record as a whole to determine if the decision is supported by substantial evidence. <u>Bloodsworth</u>, 703 F.2d at 1239. The Court must also determine whether the Administrative Law Judge applied the proper legal standards. No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied. <u>Richardson</u>, <u>supra</u>.

In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 C.F.R. § 404.1520.

First the claimant must not be engaged in substantial gainful activity after the date the disability began.  Second the claimant must provide evidence of a severe impairment.  Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide sufficient evidence to accomplish step three, the analysis proceeds to step four.  In step four, the ALJ must determine the claimant's residual functional capacity, then determine if the claimant can perform his or her past relevant work.  The claimant has the burden of proving the inability to perform past relevant work. If the claimant's evidence shows an inability to perform past relevant work, the burden shifts to the ALJ in step five.  The ALJ must show that there is other gainful work in the national economy which the claimant can perform.  Once the ALJ identifies such work, the burden returns to the claimant to prove his or her inability to perform such work.

A. Residual Functional Capacity Determination

The plaintiff contends that the ALJ improperly relied on the opinions of the non-examining State Agency physicians in determining that the plaintiff retained the residual functional capacity to perform the exertional demands of light work.  The plaintiff argues that the ALJ ignored the testimony of Patricia

Bucco, his sister, as well as the findings of Dr. Weinberger, the consultative psychologist.

The Eleventh Circuit has held that the opinion of a reviewing, non-examining physician, standing alone, cannot constitute substantial evidence upon which to base an administrative decision. Sharfarz v. Bowen, 825 F.2d 278, 280(11th Cir. 1987), citing Spencer on Behalf of Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985). In Sharfarz and Spencer, the ALJs rejected the opinions of the plaintiffs' treating physicians in favor of those rendered by non-examining physicians. The instant case is distinguishable because the non-examining physicians reviewed the medical evidence of record and explicitly relied on that evidence in making their determinations. Moreover, none of the treating or consultative physicians stated that the plaintiff was unable to work or identified any exertional limitations.

Regarding the plaintiff's mental impairment, the plaintiff received no treatment from any psychiatrist or psychologist. The consultative examination performed by Dr. Weinberger indicated that the plaintiff had serious memory problems, but Dr. Weinberger also noted that the plaintiff nodded off repeatedly during the interview, explaining that he had taken his medication prior to meeting with the doctor. At the first administrative hearing, Dr. Lehman pointed out that Dr.

28

Weinberger's report did not mention that the plaintiff was taking methadone, which is a sedative.   Dr. Lehman and the two consultative non-examining psychologists disagreed with Dr. Weinberger's diagnoses of Amnesic Disorder, PTSD and Social Phobia because of the influence of the plaintiff's medication and their belief that those diagnoses relied too much upon the historical information provided by the plaintiff.

The ALJ found that the plaintiff's impairments could be expected to produce the symptoms alleged by the plaintiff, and supported by the testimony of his sister, but found that the severity of those symptoms was not supported by the record as a whole.   That conclusion is supported by substantial evidence, and should not be disturbed.

B.   <u>Failure of the ALJ and the Appeals Council to Consider Additional Evidence</u>

The plaintiff also argues that the ALJ erred in refusing to keep the record open to allow the plaintiff to produce recent records from his treating physicians, and that the Appeals Council erred by failing to consider the additional evidence submitted by the plaintiff's counsel.   The plaintiff points out that the ALJ noted the absence of medical information during the time period between the first and second hearings, but refused to keep the record open so that those records could be provided.

29

The plaintiff points out that the ALJ is charged with developing a fair and full record.  Smith v. Bowen, 792 F.2d 1547, 1550 (11th Cir. 1985), citing Todd v. Heckler, 736 F.2d 641, 642 (11th Cir. 1984).  The Commissioner responds that remand for failure by an ALJ to develop the record is only required where "the record reveals evidentiary gaps which result in unfair or 'clear prejudice.'"  Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997), quoting Brown v. Shalala, 44 F.3d 931, 934-35 (11th Cir. 1995).

At the second hearing, counsel for the plaintiff and the plaintiff himself described their attempts to obtain records and a questionnaire from Dr. Toward, who they alleged had been treating the plaintiff for two years.  The ALJ declined to grant the plaintiff additional time to supply those records.  This did not prejudice the plaintiff, since no records from Dr. Toward ever were obtained.

Records were obtained from Dr. Farronay, a neurologist, and a residual functional capacity assessment was provided by Dr. Avni.  These records were provided to the Appeals Council, and were considered by that body.  The Appeals Council determined that the additional evidence did not supply a basis for changing the ALJ's decision. (R:10-11)

Dr. Avni's residual functional capacity assessment indicated that the plaintiff could not perform the exertional demands of even sedentary work. Although Dr. Avni stated that he had "lifetime" contact with the plaintiff, there is nothing in the record to reflect that he performed any examination of the plaintiff in connection with his residual functional capacity assessment, and there are no reports or progress notes documenting any treatment of the plaintiff by this doctor. Moreover, Dr. Avni stated that the plaintiff's limitations were not present prior to October 2007. Dr. Avni's opinion was entitled to minimal, if any weight.

Dr. Farronay's records indicate that the plaintiff's physical examinations were normal, but that he did display neurological symptoms. Many of Dr. Farronay's reports stated that the plaintiff's symptoms were well-controlled, and the doctor recommended pain management consultation and physical therapy. Additionally, although Dr. Farronay prescribed methadone for the plaintiff, the dosage began with 40 mg and eventually was decreased to 10 mg. This dosage is substantially reduced from the 170 mg the plaintiff was taking in 2004, and suggests that the plaintiff's level of pain was correspondingly lower than it was at the time he was treated by Dr. Kraus at JFK Medical Center.

The only evidence which arguably could have altered the decision reached by the ALJ was the October 2007 MRI of the plaintiff's spine, which revealed moderate to severe scoliosis; multilevel moderate to severe degenerative disc disease from L2-L3 through L4-L5 (more pronounced at L2-L3 where there was evidence of an old compression fracture); moderate to severe central canal stenosis more pronounced at L2-L3 and L3-L4, and no evidence of myelopathy or demyelinating disease.[2]  Dr. Farronay's treatment notes after that time indicate that the plaintiff's condition was not improving.  Thus, it appears that the plaintiff's residual functional capacity may have diminished in the months following his second administrative hearing.

In determining whether the plaintiff is entitled to disability income benefits, the ALJ must determine whether the plaintiff was disabled as of the date he was last insured; regarding SSI benefits, the relevant date is the date of the plaintiff's application for benefits.  Casey v. Secretary of Health and Human Services, 987 F.2d 1230 (6th Cir. 1993).  In the instant case, the plaintiff was last insured on September 30, 2004, and he applied for disability and SSI benefits on April 29, 2005.  The

---

[2] It is possible that this MRI was the basis for Dr. Avni's statement that the plaintiff's restrictions dated to October 2007.

additional evidence submitted by the plaintiff, and considered by the Appeals Council, failed to establish that the plaintiff was disabled on either of the relevant dates.

The undersigned concludes that the plaintiff was not prejudiced by the ALJ's refusal to grant a continuance or to keep the record open for a brief period after the hearing, and that the decision of the Appeals Council to deny review was based on substantial evidence. Therefore, the plaintiff was not under a disability during the relevant time periods and is not entitled to reversal or remand.

## VI. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the defendant's Motion for Summary Judgment (DE 14) be GRANTED, and the plaintiff's Motion for Summary Judgment (DE 10) be DENIED.

The parties will have ten days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, for consideration by The Honorable William P. Dimitrouleas, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein. LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958

33

(1988); <u>RTC v. Hallmark Builders, Inc.</u>, 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 30th day of September, 2009.

_____
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

Harvey Kaurman, Esq. (P)
AUSA David I. Mellinger (D)